UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| JESSE C. TRENTADUE,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STAY (DOC. NO. 18), AND DENYING WITHOUT PREJUDICE PLAINTIFFS' MOTIONS FOR SCHEDULING CONFERENCE (DOC. NOS. 14 & 16) AND MOTION FOR *VAUGHN* INDEX AND IN-CAMERA REVIEW (DOC. NO. 27)**<br><br>Case No. 2:24-cv-00105<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Daphne A. Oberg |

In February 2024, Jesse C. Trentadue[1] brought this action under the Freedom of Information Act[2] ("FOIA"), challenging the Federal Bureau of Investigations' failure to produce documents in response to his 2015 and 2016 FOIA requests seeking documents related to the FBI's role in the 1995 Oklahoma City bombing.[3] Mr. Trentadue filed two motions for a scheduling conference, seeking a scheduling order

---

[1] Mr. Trentadue, who is an attorney, proceeds pro se in this action.

[2] 5 U.S.C. § 552.

[3] (*See* Compl., Doc. No. 1.)

1

permitting discovery.[4]  In response, the FBI moved to stay the case, asking the court to set a production schedule for the FBI to review and produce responsive records—and to stay the case until production is complete.[5]  The FBI proposes a processing rate of 500 pages per month, in accordance with its interim release policy for large requests.[6]  Based on the number of records identified, production under this schedule would take approximately 11.5 years (as of the time the FBI filed its motion).[7]

After filing the motion to stay, the FBI began reviewing and producing responsive documents to Mr. Trentadue at its proposed rate of 500 pages per month.[8]  Mr. Trentadue then filed a motion for a *Vaughn* index and in-camera review, contesting the FBI's withholding of documents from its production.[9]

As explained below, a limited stay to permit the FBI to complete production is warranted, but the FBI's proposed processing rate is woefully inadequate under the circumstances.  Where the FBI has not shown it followed its own procedures in

---

[4] (Pl.'s Mot. for a Scheduling Conf., Doc. No. 14; Pl.'s Mot. for a Scheduling Conf., Doc. No. 16.)

[5] (United States' Mot. to Stay Case and Req. for a Status Conf. ("Mot. to Stay"), Doc. No. 18.)

[6] (*See id.* at 2, 4.)

[7] (*See* Pl.'s Opp'n to FBI's Mot. to Stay ("Opp'n") 2, Doc. No. 19.)

[8] (*See* Notices of Release of Docs., Doc. Nos. 26, 32, 33, 36, 37, 40, 41, 42.)  Mr. Trentadue notes that while the FBI appears to be *reviewing* 500 pages per month, the number produced each month is lower because some reviewed documents have been withheld.  (*See* Pl.'s Evidentiary Objs. to FBI's Reply Mem. in Supp. of Mot. to Stay, Doc. No. 24.)

[9] (Mot. for Vaughn Index and In-Camera Rev., Doc. No. 27.)

2

responding to Mr. Trentadue's FOIA requests, and it failed to produce any documents for more than eight years (until after Mr. Trentadue filed suit), a substantially higher processing rate is merited. Accordingly, the FBI's motion to stay[10] is granted in part and denied in part, and Mr. Trentadue's motions for a scheduling order and *Vaughn* index[11] are denied without prejudice. The parties are ordered to meet and confer regarding a processing rate and submit a joint motion or separate motions justifying their proposal(s) within fourteen days.[12]

## BACKGROUND

A. *Statutory Framework*

FOIA requires an agency responding to a records request to determine whether to comply within twenty business days, and to "immediately" notify the person making the request of the "determination and the reasons therefor."[13] In "unusual circumstances," the agency may extend this deadline by ten days.[14] Records the

---

[10] (Doc. No. 18.)

[11] (Doc. Nos. 14, 16, 27.)

[12] Mr. Trentadue may file renewed motions addressing entry of a scheduling order, discovery, and a *Vaughn* index (if appropriate) after production is complete.

[13] 5 U.S.C. § 552(a)(6)(A)(i)(I).

[14] *Id.* § 552(a)(6)(B)(i). The statute defines "unusual circumstances" to mean the need to search for and collect records from other facilities; "the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request"; or the need for consultation with other agencies having a substantial interest in the request. *Id.* § 552(a)(6)(B)(iii).

agency determines are subject to release must be "promptly" produced.[15] If an agency fails to comply within the statutory time limits, the requester may sue to enforce compliance.[16] But § 552(a)(6)(C)(i) provides: "If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records."[17] "Exceptional circumstances" does not include "a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests."[18]

Under FOIA, agencies can promulgate regulations providing for "multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests."[19] FOIA also requires agencies to promulgate regulations for "expediting processing" if the requester demonstrates "a compelling need."[20]

---

[15] *Id.* § 552(a)(3)(A).

[16] *Id.* § 552(a)(4)(B), (a)(6)(C)(i).

[17] *Id.* § 552(a)(6)(C)(i).

[18] *Id.* § 552(a)(6)(C)(ii).

[19] *Id.* § 552(a)(6)(D)(i).

[20] *Id.* § 552(a)(6)(E)(i)(I).

### B. FBI's FOIA Program

The FBI provided a declaration from Michael Seidel, Section Chief of the Record/Information Dissemination Section, regarding the FBI's FOIA program and its response to Mr. Trentadue's requests.[21] According to this declaration, as of June 2024 (when the declaration was signed), the FBI employed 236 Government Information Specialists, with support from 108 contractors, to process requests for FBI information under FOIA and to conduct classification and declassification reviews.[22] FOIA requests pass through various "units" and require action by multiple employees.[23] The FBI has one of the largest and most complex FOIA programs in the federal government, reviewing an average of approximately one million pages for annual dissemination to the public.[24]

According to Mr. Seidel, the FBI has experienced sustained growth in the volume of incoming FOIA requests and cases in litigation from 2016 to present.[25] In fiscal year 2022, the FBI received its highest number of requests from the public—43,363—representing a 95% increase in requests from fiscal year 2016.[26] Likewise, the number of total pending requests has increased steadily since 2015: in 2015, the FBI had 4,829

---

[21] (Decl. of Michael G. Seidel ("Seidel Decl."), Doc. No. 18-1.)

[22] (*Id.* ¶ 32.)

[23] (*Id.* ¶ 33.)

[24] (*Id.* ¶ 34.)

[25] (*Id.* ¶ 35.)

[26] (*Id.*)

pending requests, while it had more than 12,000 unaddressed requests at the end of fiscal year 2023.[27] During the same period, the program's personnel count has increased only minimally.[28]

In 2010, to prevent the monopolization of the program by "a few large-queue requesters," the FBI instituted a policy of reviewing and processing records in 500-page increments per month per request (the "interim release policy").[29] The FBI also established five processing queues based on the size of the request.[30] The largest is the "extra-large queue" for requests of more than 5,000 pages.[31] Within each queue, requests are processed in "first in, first out" order.[32] By making interim releases in 500-reviewed-page increments, the FBI "regularly provides more pages to more requesters across the five queues, thus avoiding a system where a few, large queue requests or litigations monopolize finite processing resources."[33]

In 2023, the Department of Justice ("DOJ") issued a memorandum stating the average time for processing a simple FOIA request at the DOJ had more than

---

[27] (*Id.* ¶ 36.)

[28] (*Id.*)

[29] (*Id.* ¶ 39.)

[30] (*Id.* ¶ 40.)

[31] (*Id.*)

[32] (*Id.*)

[33] (*Id.*)

quadrupled since 2018.[34] The memorandum directed the FBI to reduce its FOIA backlog to September 2018 levels no later than December 15, 2025.[35] Mr. Seidel asserts, "[b]ased on the directive within the DOJ memo and the drastic growth in the volume of [FOIA] requests handled by the FBI's [FOIA] program over the last six years, it is imperative that the well recognized FBI interim release policy of 500 pages per month per requester remain intact in this case."[36]

As of June 2024, there were approximately 474 FBI FOIA cases in litigation.[37] The FBI was making interim releases of nonexempt records in forty-seven cases, processing more than 22,869 pages per month.[38] In his declaration, Mr. Seidel explains "[f]or every resource devoted to processing records in [FOIA] lawsuits, fewer pages can be processed for requesters whose requests are pending at the administrative stage, resulting in the current size of the FBI's FOIA backlog."[39] Mr. Seidel asserts "[i]t is precisely this scenario that resulted in the long wait time in backlog for [Mr. Trentadue's] request."[40]

---

[34] (*Id.* ¶ 37.)

[35] (*Id.*)

[36] (*Id.*)

[37] (*Id.* ¶ 38.)

[38] (*Id.*)

[39] (*Id.*)

[40] (*Id.*)

### C. Mr. Trentadue's FOIA Requests

Mr. Trentadue's FOIA requests relate to the FBI's alleged "involvement in the Oklahoma City Bombing because of the agents/informants that it had embedded with the perpetrators of that terrorist attack."[41] According to Mr. Trentadue, Roger Moore (an undercover FBI operative, now deceased) was involved in a sting operation called "Punchout" during which he traveled with Timothy McVeigh (the perpetrator of the attack) in the months leading up to the bombing, and provided Mr. McVeigh with explosives used in the bombing.[42] Mr. Trentadue also alleges Mr. McVeigh participated in robberies carried out by a gang known as the Aryan Republican Army ("ARA"), and is reported to have used money obtained in the robberies to fund the bombing.[43] Mr. Trentadue alleges the FBI titled its investigation of the ARA as "BOMBROB," but the ARA was "actually a front group created by the FBI in which [it] had embedded at least one informant."[44]

#### 1. Punchout Request

On September 26, 2015, Mr. Trentadue submitted a FOIA request to the FBI for records concerning Roger Moore's involvement in Operation Punchout.[45] On October 5, 2015, the FBI acknowledged receipt of this request, indicated it was searching for

---

[41] (Compl., Doc. No. 1 at 1.)

[42] (Id. ¶¶ 8–13.)

[43] (Id. ¶¶ 29–30.)

[44] (Id. ¶¶ 32–33.)

[45] (See id. ¶ 16; Ex. E to Compl., Punchout Request, Doc. No. 1-5.)

responsive records, and provided a link to a website to check the status.[46] On October 8, the FBI advised Mr. Trentadue that "unusual circumstances" applied which would delay its determination, and invited him to respond in writing to discuss reducing the scope of the request and payment of search and duplication costs.[47] On October 21, the FBI informed Mr. Trentadue it had located approximately 30,129 pages of potentially responsive records, which would cost $910.00 in duplication fees.[48] Mr. Trentadue responded on October 27, agreeing to pay the fees.[49] On April 22, 2016, the FBI notified Mr. Trentadue that it had located 32,580 pages of documents and one DVD responsive to his request, which would cost $1,000.00 in duplication fees.[50] Mr. Trentadue responded on April 29, again agreeing to pay the fees.[51] Mr. Trentadue inquired about the status of his request on July 28 and September 6, and asked that the interim release policy of 500 pages per month be applied.[52] On September 19, the FBI notified Mr. Trentadue his request was awaiting assignment to an analyst.[53]

---

[46] (*See* Seidel Decl. ¶ 6, Doc. No. 18-1; Ex. B to Seidel Decl., Doc. No. 18-1 at 32–34.)

[47] (*See* Seidel Decl. ¶ 7, Doc. No. 18-1; Ex. C to Seidel Decl., Doc. No. 18-1 at 35–36.)

[48] (*See* Seidel Decl. ¶ 8, Doc. No. 18-1; Ex. D to Seidel Decl., Doc. No. 18-1 at 37–39.)

[49] (*See* Seidel Decl. ¶ 9, Doc. No. 18-1; Ex. E to Seidel Decl., Doc. No. 18-1 at 40–45.)

[50] (*See* Seidel Decl. ¶ 10, Doc. No. 18-1; Ex. F to Seidel Decl., Doc. No. 18-1 at 46–48.)

[51] (*See* Seidel Decl. ¶ 11, Doc. No. 18-1; Ex. G to Seidel Decl., Doc. No. 18-1 at 49–54.)

[52] (*See* Seidel Decl. ¶¶ 12–13, Doc. No. 18-1; Exs. H & I to Seidel Decl., Doc. No. 18-1 at 55–58.) Mr. Trentadue disputes that he agreed to a 500-page per month release rate. (*See* Opp'n 8–9, Doc. No. 19.)

[53] (*See* Seidel Decl. ¶ 14, Doc. No. 18-1; Ex. J to Seidel Decl., Doc. No. 18-1 at 59–60.)

In August 2018, in response to another inquiry from Mr. Trentadue, the FBI notified him that his request was in the "extra-large track" of the FBI's multi-track backlog of unassigned FOIA requests, which (at that time) contained requests in excess of 950 pages.[54] When Mr. Trentadue inquired again in January 2024, just before he filed this lawsuit, the FBI responded that his request was still awaiting assignment to an analyst.[55] The FBI produced no documents in response to Mr. Trentadue's 2015 request until August 2024 (after this case was filed), when the FBI provided the first batch of documents under its interim release policy.[56]

2. BOMBROB Request

On July 29, 2016, Mr. Trentadue submitted a FOIA request to the FBI seeking records relating to Timothy McVeigh and ARA member Richard Lee Guthrie, Jr. (both now deceased) for the years 1993 through 1995—including records of Mr. McVeigh's contacts with Mr. Guthrie and the ARA.[57] The FBI responded in much the same way as to the Punchout request. On August 9, 2016, the FBI acknowledged receipt of the request, and on August 31, it notified Mr. Trentadue approximately 36,795 pages of

---

[54] (*See* Seidel Decl. ¶ 16, Doc. No. 18-1; Ex. L to Seidel Decl., Doc. No. 18-1 at 64–65.)

[55] (*See* Seidel Decl. ¶¶ 17–18, Doc. No. 18-1; Ex. M to Seidel Decl., Doc. No. 18-1 at 66–68.)

[56] (*See* Notice of Release of Docs., Doc. No. 26.) Mr. Trentadue disputes that the documents produced are responsive to his request. (*See id.* at 3.)

[57] (*See* Compl. ¶ 35, Doc. No. 1; Ex. M to Compl., BOMBROB Request, Doc. No. 1-13.)

responsive records had been located, which would cost $1,135.00 in duplication fees.[58] The FBI also indicated "unusual circumstances" would delay its release determination.[59] On September 6, Mr. Trentadue agreed to pay the duplication fees and asked the FBI to produce the documents pursuant to its interim release policy.[60]

On April 5, 2017, the FBI informed Mr. Trentadue an advance payment of $567.50 (fifty percent of the estimated cost) was required to proceed and invited him to reduce the scope of his request to reduce the cost and processing time.[61] Mr. Trentadue sent a check for this amount on April 12, 2017, and declined to reduce the scope of his request.[62]

On August 22, 2018, in response to Mr. Trentadue's inquiry, the FBI advised Mr. Trentadue his request was in the "extra-large track" of its multi-track backlog of unassigned FOIA requests, and again invited him to reduce the scope of his request.[63]

---

[58] (*See* Seidel Decl. ¶¶ 21–22, Doc. No. 18-1; Exs. O & P to Seidel Decl., Doc. No. 18-1 at 76–82.)

[59] (*See* Seidel Decl. ¶ 23, Doc. No. 18-1; Ex. Q to Seidel Decl., Doc. No. 18-1 at 83–84.)

[60] (*See* Seidel Decl. ¶ 24, Doc. No. 18-1; Ex. R to Seidel Decl., Doc. No. 18-1 at 85–88.) Again, Mr. Trentadue disputes that he agreed to the FBI's interim release policy. (*See* Opp'n 8–9, Doc. No. 19.)

[61] (*See* Seidel Decl. ¶ 25, Doc. No. 18-1; Ex. S to Seidel Decl., Doc. No. 18-1 at 89–91.)

[62] (*See* Seidel Decl. ¶ 26, Doc. No. 18-1; Ex. T to Seidel Decl., Doc. No. 18-1 at 92–98.)

[63] (*See* Seidel Decl. ¶ 27, Doc. No. 18-1; Ex. U to Seidel Decl., Doc. No. 18-1 at 99–100.)

The FBI produced no documents responsive to Mr. Trentadue's 2016 request until August 2024 (after this case was filed).[64]

### 3. Post-Litigation Response

Mr. Trentadue filed this case on February 9, 2024.[65] On March 25, 2024, the FBI sent Mr. Trentadue a letter informing him that records responsive to his Punchout and BOMBROB requests were available in the FBI's FOIA Library on its public website.[66] The letter also indicated "[a]dditional records potentially responsive to your subject may exist," and requested that Mr. Trentadue respond if he would like the FBI to conduct a search of its Central Records System.[67] On April 15, 2024, the FBI informed Mr. Trentadue it had received his check for $567.50 dated April 12, 2017, and opted to issue a refund.[68]

In July 2024, the FBI began reviewing and producing documents responsive to Mr. Trentadue's requests at a rate of 500 pages per month (combined for both

---

[64] (*See* Notice of Release of Docs., Doc. No. 26.) Mr. Trentadue disputes that the documents produced are responsive to his request. (*See id.* at 3.)

[65] (*See* Compl., Doc. No. 1.)

[66] (*See* Seidel Decl. ¶ 29, Doc. No. 18-1; Ex. V to Seidel Decl., Doc. No. 18-1 at 101–05.) Mr. Trentadue contends the FBI posted only 280 relevant pages on its public website. (*See* Opp'n 9–10, Doc. No. 19.)

[67] (Ex. V to Seidel Decl., Doc. No. 18-1 at 101–05.)

[68] (*See* Seidel Decl. ¶ 30, Doc. No. 18-1; Ex. W to Seidel Decl., Doc. No. 18-1 at 106–09.)

requests).[69] The FBI produced the first responsive documents in August 2024 and has made eight monthly releases through the present.[70]

## ANALYSIS

### A. FBI's Failure to Show Due Diligence

The FBI argues this case should be stayed to allow it to review and produce documents responsive to Mr. Trentadue's requests under the agency's 500-page per month interim release policy.[71] Citing 5 U.S.C. § 552(a)(6)(C)(i), the FBI notes a court can give an agency additional time to complete its review if the agency shows "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request."[72] According to the FBI, exceptional circumstances exist here due to the increase in FOIA requests annually since 2016, the overall high volume of unaddressed pending requests, and the FBI's limited personnel.[73] The FBI also asserts agencies show "due diligence" by processing requests on a "first-in, first-out" basis.[74] The FBI argues it is "imperative" that the 500-page interim release policy be

---

[69] (*See* Notices of Release of Docs., Doc. Nos. 26, 32, 33, 36, 37, 40, 41, 42.) As noted, fewer than 500 pages have been produced each month because some documents are being withheld after review.

[70] (*See id.*)

[71] (Mot. 1–2, Doc. No. 18.)

[72] 5 U.S.C. § 552(a)(6)(C)(i).

[73] (Mot. 3–4, Doc. No. 18.) The FBI fails to explain the significance of the increase in requests through the years, where Mr. Trentadue submitted his requests in 2015 and 2016, when the numbers were much lower.

[74] (*Id.* at 3.)

followed in this case, in order to reduce the FBI's backlog and "avoid[] a system where a few large queue requests or requests that are in litigation monopolize the [FBI's] finite resources."[75]

In his opposition, Mr. Trentadue argues the FBI has shown neither exceptional circumstances nor due diligence under § 552(a)(6)(C)(i).[76] Mr. Trentadue asserts that "for almost a decade the FBI has failed to make any attempt to meet its FOIA obligations in this case," even though the case involves a matter of widespread media and public interest.[77] He also notes the FBI has already identified the universe of responsive documents, but its proposed production schedule would take nearly 11.5 years.[78] Mr. Trentadue argues the FBI should be ordered to process and produce the records at a rate of 5,500 pages per month instead.[79]

In support of its argument, the FBI primarily relies on *Open America v. Watergate Special Prosecution Force*.[80] In this case, the District of Columbia Circuit interpreted § 552(a)(6)(C)(i) to apply when an agency is "deluged with a volume of requests for information vastly in excess of that anticipated by Congress," "the existing resources are inadequate to seal with the volume of such requests within the time limits of subsection

---

[75] (*Id.* at 4.)

[76] (Opp'n 4, 10, Doc. No. 19.)

[77] (*Id.* at 11.)

[78] (*Id.* at 7.)

[79] (*Id.* at 11.)

[80] 547 F.2d 605 (D.C. Cir. 1976).

(6)(A)," and "the agency can show it is exercising due diligence in processing the requests."[81] The court concluded an agency should only be ordered to give priority to a particular request in two circumstances:

> (1) when the agency was *not showing due diligence in processing plaintiff's individual request* or was lax overall in meeting its obligations under [FOIA] with all available resources, and (2) when plaintiff can show a genuine need and reason for urgency in gaining access to Government records ahead of prior applicants for information.[82]

As noted by the FBI, the court in *Open America* (and other courts) have found agencies meet the "due diligence" requirement by addressing requests on a "first-in, first-out" basis.[83] As the FBI also points out, courts have found the 500-page monthly interim release policy reasonable, even where it results in a lengthy delay in processing an individual request.[84] On the other hand, Mr. Trentadue cites various cases in which courts required higher processing rates based on public interest in the subject matter of the request or a prior delay in addressing the request.[85]

---

[81] *Id.* at 616 (internal quotation marks omitted).

[82] *Id.* at 615–16 (emphasis added).

[83] *Id.* at 616; *see also Edmond v. U.S. Att'y*, 959 F. Supp. 1, 3 (D.D.C. 1997); *Crooker v. U.S. Marshals Serv.*, 577 F. Supp. 1217, 1218 (D.D.C. 1983).

[84] *See Martínez v. Dep't of Just.*, No. 16-1506, 2023 U.S. Dist. LEXIS 235567, at *4 (D.D.C. Sept. 27, 2023) (unpublished).

[85] *See, e.g.*, *ACLU Found. of S. Cal. v. U.S. Immigr. & Customs Enf't*, 705 F. Supp. 3d 1077, 1092 (C.D. Cal. 2023) (ordering request for information about ICE's treatment of hospitalized detainees to be processed at rate of 3,000 pages per month); *Open Soc'y Just. Initiative v. Cent. Intel. Agency*, 399 F. Supp. 3d 161, 162, 167 (S.D.N.Y. 2019) (ordering Department of State and Department of Defense to process 5,000 pages per month related to the killing of a Washington Post journalist in Saudi custody); *Seavey v.*

Even assuming extraordinary circumstances exist based on the high volume of FOIA requests the FBI receives, the FBI has not met its burden under § 552(a)(6)(C)(i) to demonstrate due diligence in responding to Mr. Trentadue's requests. In support of its due diligence claim, the FBI relies exclusively on its "first-in, first-out" policy and multitrack processing system.[86] Notably absent from the FBI's briefing or supporting declaration is any assertion the FBI *actually processed Mr. Trentadue's requests* on a first-in, first-out basis, consistent with agency policy. Unlike several cases the FBI relies on, the FBI does not explain how many other requests are "in line" before Mr. Trentadue's requests in the extra-large track—nor does it provide any other information suggesting Mr. Trentadue's specific requests were processed on a "first-in, first-out" basis.[87] Mr. Trentadue submitted his requests in 2015 and 2016, and the FBI identified

---

*Dep't of Just.*, 266 F. Supp. 3d 241, 247–48 (D.D.C. 2017) (ordering FBI to process 2,850 pages per month for documentary filmmaker's request for FBI records related to anti-war movement); *Clemente v. FBI*, 71 F. Supp. 3d 262, 264–65 (D.D.C. 2014) (ordering FBI to process 5,000 pages per month where requests involved serious allegations of widespread corruption in law enforcement, plaintiff "face[d] a very limited lifespan" and had waited two years before the FBI produced any responsive material); *L.A. Times Commc'ns LLC v. U.S. Dep't of Homeland Sec.*, No. 2:20-cv-10911,

2022 WL 18932816, at *3 (C.D. Cal., 2022) (denying reconsideration of 3,000 page per month processing rate because, among other reasons, defendants did not respond to FOIA request until after commencement of a lawsuit); *Nat. Res. Def. Council v. Dep't of Energy*, 191 F. Supp. 2d 41, 42–44 (D.D.C. 2002) (ordering production of 7,500 pages within two months where the agency was "woefully tardy in its processing of Plaintiff's FOIA request").

[86] (*See* Mot. 3, Doc. No. 18.)

[87] *Cf. Crooker*, 577 F. Supp. at 1218 (noting the agency "indicated that there are over 400 requests that must be processed to completion before plaintiff's request can be

the universe of responsive documents within weeks of each request. But the FBI then failed to make *any* progress toward responding to Mr. Trentadue's request for more than eight years—until after he filed this lawsuit. The FBI produced *no* documents during this time, even under its own 500-page monthly interim release policy.[88]

Indeed, if the FBI were processing Mr. Trentadue's requests on a "first-in, first-out" basis, this would necessarily mean the FBI has produced *no* documents responsive to *any* extra-large request submitted by anyone since September 26, 2015 (at least as of July 2024). If this is true, it raises troubling questions regarding the diligence of the FBI's overall approach to large requests. If, on the other hand, the FBI has produced documents in response to other extra-large requests submitted since September 2015—but not Mr. Trentadue's—its policy justification fails. This would mean the FBI has not adhered to the very policy it is relying on to justify its position. Problematically, the FBI provides no evidence it applied its own policies to Mr. Trentadue's request—nor does it explain why it suddenly began producing documents under the interim release policy only after Mr. Trentadue filed suit.

---

completed," and citing an agency affidavit); *Edmond*, 959 F. Supp. at 4 (noting the government had identified thirty-one requests before the plaintiff's in the queue).

[88] Notably, if the FBI had begun processing responsive documents at a combined rate of 500 pages per month when Mr. Trentadue submitted his requests, production would be nearly complete. But the FBI also fails to explain why Mr. Trentadue's requests, which address discrete topics, should be combined for purposes of the 500-page monthly interim release policy. If the FBI had processed 500 pages per month for each request, beginning at the time of the request, production would have been completed years ago.

In sum, the FBI has substantially delayed processing Mr. Trentadue's FOIA requests, failed to produce any documents under its own interim release policy for more than eight years, and offers no evidence it processed the requests on a "first-in, first-out" basis pursuant to agency policy. Accordingly, the FBI has not demonstrated due diligence in responding to Mr. Trentadue's requests under § 552(a)(6)(C)(i).

B. Next Steps

Even though the FBI has not met its burden under § 552(a)(6)(C)(i), it makes sense, as a practical matter, to set a processing rate and stay the case while the FBI completes its production. (Mr. Trentadue appears to acknowledge this, where he argues the FBI should produce documents at a higher rate rather than arguing the documents should be produced all at once.)[89] The question remains what processing rate is appropriate under the circumstances. The FBI's proposal to simply follow its 500-page per month interim release policy for the next eleven years is wholly inadequate, given its failure to show due diligence and the lengthy delay (more than eight years) that has already occurred.[90] Moreover, the subject of the requests is a matter of significant public interest. Under these circumstances, a substantially higher

---

[89] (*See* Opp'n 11, Doc. No. 19.)

[90] Under the FBI's proposal, the total time from the date of the first request to the date production is completed would be more than *twenty years*.

processing rate is merited.[91] However, further information from the parties would be helpful in determining the appropriate processing rate at this stage.

For these reasons, the FBI's motion to stay is granted in part and denied in part. The case will be stayed to allow the FBI to complete its production, but the FBI's request to set a 500-page monthly processing rate is denied. The parties must meet and confer in good faith to try to reach an agreement as to the processing rate. The parties must then submit a joint motion (if they reach an agreement) or separate motions justifying their proposal(s) regarding the appropriate processing rate in light of this order.

### C.  Mr. Trentadue's Motions for a Scheduling Conference and Vaughn Index

Mr. Trentadue seeks entry of a scheduling order permitting discovery and setting a deadline for summary judgment motions.[92] He also moves for an order requiring the FBI to provide a *Vaughn* index (a description and detailed justification for an agency's nondisclosure of each requested document)[93] and asks the court to review the

---

[91] *See, e.g.*, *L.A. Times Commc'ns LLC*, 2022 WL 18932816, at *3 (requiring a processing rate of 3,000 pages per month based on "Defendants' failure to respond to Plaintiff's requests until the commencement of this action, the fact that Defendants' counterproposal would require nearly two years of additional review, Defendants' failure to articulate good cause for their failure to respond to Plaintiff's requests or for their proposed slower pace of review, and the seriousness of the underlying allegations regarding sexual and other abuse against ICE detainees.").

[92] (*See* Mots. for Scheduling Conference, Doc. Nos. 14, 16.)

[93] *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

documents in-camera.[94]  All these requests are premature, where the FBI has not yet processed the responsive documents and determined the extent of disclosure.[95]  Accordingly, the motions are denied without prejudice and may be refiled (as appropriate) after the FBI's production is complete.

## CONCLUSION

The FBI's motion to stay[96] is granted in part and denied in part.  Mr. Trentadue's motions for a scheduling conference[97] and motion for a *Vaughn* index and in-camera review[98] are denied without prejudice.  Within fourteen days, the parties shall meet and confer regarding a processing rate and file either a joint motion or separate motions justifying their proposal(s).

DATED this 27th day of March, 2025.

BY THE COURT:

_____
Daphne A. Oberg
United States Magistrate Judge

---

[94] (Mot. for *Vaughn* Index and In-camera Review, Doc. No. 27.)

[95] *See Edmond*, 959 F. Supp. at 5 ("It is well settled that *Vaughn* Indexes are generally unavailable until after the agency has decided the extent of disclosure.").

[96] (Doc. No. 18.)

[97] (Doc. Nos. 14, 16.)

[98] (Doc. No. 27.)